WMP:JMK/CLN
F. #2014R00437

GARAUFIS, J.

REYES, M.J.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

JARED MITCHELL,
RICHARD BROWN,
CHRISTOPHER F. CASTALDO,
GERALD COCUZZO,
        also known as "Gerry,"
NAVEED KHAN,
        also known as "Nick,"
HERSCHEL C. KNIPPA III,
        also known as "Tres,"
MAROOF MIYANA,
PRANAV PATEL and
LOUIS F. PETROSSI,

              Defendants.

- - - - - - - - - - - - - - -X

I N D I C T M E N T

Cr. No. **CR 16        00234**
(T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18,
U.S.C., §§ 371, 981(a)(1)(C), 982(a)(1),
1001(a)(2), 1349, 1956(h), 2 and 3551
et seq.; T. 21, U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

<u>INTRODUCTION</u>

    At all times relevant to this Indictment, unless otherwise indicated:

I.    <u>The Defendants</u>

    1.    The defendant JARED MITCHELL, a resident of New York, New York,

was the Managing Partner of Mitchell & Sullivan Capital LLC, an investor relations firm located

in New York, New York.

    2.    The defendant RICHARD BROWN, a resident of Huntington, New York,

was a registered broker.   In or about and between February 2012 and November 2015, BROWN

was employed as a broker at BD Firm 1, a broker-dealer registered with the United States Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority, Inc. ("FINRA"), at its office in Staten Island, New York.   The identity of BD Firm 1 is known to the Grand Jury.

3.     The defendant CHRISTOPHER F. CASTALDO, a resident of Glen Head, New York, was the Founder and Chief Executive Officer of StockTradersPress, Inc. and the Founder and President of Wall Street Buy Sell Hold Inc. ("WSBSH"), firms that provided investment research to potential investors.   CASTALDO previously worked as a registered broker at Stratton Oakmont, Inc., a now-defunct Long Island, New York broker-dealer.

4.     The defendant GERALD COCUZZO, also known as "Gerry," a resident of Delray Beach, Florida, was a registered broker.   Since December 2014, COCUZZO was employed as a broker at BD Firm 2, a broker-dealer registered with the SEC and FINRA, at its office in Boca Raton, Florida.   The identity of BD Firm 2 is known to the Grand Jury.

5.     The defendant NAVEED KHAN, also known as "Nick," a resident of Staten Island, New York, was a registered broker.   Since April 2013, KHAN was employed as a broker at BD Firm 3, a broker-dealer registered with the SEC and FINRA, at its office in Staten Island, New York.   The identity of BD Firm 3 is known to the Grand Jury.

6.     The defendant HERSCHEL C. KNIPPA III, also known as "Tres," a resident of Dallas, Texas, was the owner and head trader at Kenai Capital Management LLC, a commodities trading firm located in Dallas, Texas.   KNIPPA regularly appeared on various financial news networks, including Fox Business and the Business News Network, to discuss investment strategies.

2

7.     The defendant MAROOF MIYANA, a resident of Boca Raton, Florida, was a registered broker.   Since December 2014, MIYANA was employed as a broker at BD Firm 4, a broker-dealer registered with the SEC and FINRA, at its office in Pompano Beach, Florida.   The identity of BD Firm 4 is known to the Grand Jury.

8.     The defendant PRANAV PATEL, a resident of Tamarac, Florida, was a registered broker.   In or about and between January 2015 and December 2015, PATEL was employed as a broker at BD Firm 5, a broker-dealer registered with the SEC and FINRA, at its office in Boca Raton, Florida.   The identity of BD Firm 5 is known to the Grand Jury.

9.     The defendant LOUIS F. PETROSSI, a resident of Reno, Nevada, was the Founder and Chief Executive Officer of the Wealth Research Institute, an investment research firm.

II.     The Publicly Traded Company and Related Shell Company

10.     ForceField Energy Inc. ("ForceField") was a Nevada corporation with its principal place of business in New York, New York.   ForceField was known as SunSi Energies Inc. until the company changed its name in February 2013 as part of the company's change in focus from solar energy to Light Emitting Diode ("LED") lighting.   ForceField purported to be a worldwide distributor and provider of LED lighting products and solutions, and had a class of securities registered under Section 12 of the Securities Exchange Act of 1934.   ForceField's common stock was listed on the NASDAQ under the ticker symbol "FNRG."

11.     Adventure Overseas Holding Corporation ("AOHC") was an International Business Corporation ("IBC") formed in 2004 in Belize City, Belize.   An accountant in Belize was named in AOHC's incorporation documents as the IBC's president, secretary and sole

3

director.   In reality, Co-Conspirator 1, a ForceField executive whose identity is known to the

Grand Jury, controlled AOHC and its associated bank and brokerage accounts.

II.      Relevant Terms and Definitions

        12.      An IBC was an offshore, untaxed company, formed under the laws of a

foreign jurisdiction, which was not permitted to engage in business within the jurisdiction in which

it was incorporated.   An owner of an IBC could deposit money and transfer stock to an IBC to

facilitate banking and securities trading activities while maintaining a level of anonymity for the

IBC's true owner because an IBC's ownership records were typically not publicly available.

        13.      The term "nominee" referred to a person or firm into whose name securities

and properties were transferred to facilitate transactions, while concealing the actual owner of the

securities and properties.   The use of nominees was designed to conceal the true ownership of the

securities and other properties.

        14.      Section 15 of the Securities Exchange Act of 1934 required that, among

other things, most brokers and dealers register with the SEC and join a self-regulatory

organization.

        15.      A "private placement" was an offering of a company's stock that was not

registered with the SEC and was not offered to the investing public.   Only investors who met

certain income and net worth criteria could invest in private placements because private

placements did not have the same investor protections as offerings that were registered with the

SEC.

III.     The Fraudulent Scheme

        16.      In or about and between December 2009 and April 2015, the defendants

JARED MITCHELL, RICHARD BROWN, CHRISTOPHER F. CASTALDO, GERALD

4

COCUZZO, also known as "Gerry," NAVEED KHAN, also known as "Nick," HERSCHEL C.

KNIPPA III, also known as "Tres," MAROOF MIYANA, PRANAV PATEL and LOUIS F.

PETROSSI, together with others, including Co-Conspirator 1, engaged in a scheme to defraud

investors and potential investors in ForceField by, among other things: (a) using nominees to

purchase and sell ForceField stock without disclosing this information to investors and potential

investors; (b) orchestrating the trading of ForceField stock to create the appearance of genuine

trading volume and interest in the stock; and (c) concealing payments to stock promoters and

brokers who promoted and sold ForceField stock to investors and potential investors while

purporting to be independent of the company.

      A.    The Corrupt Brokers

        17.    In approximately October 2014, Co-Conspirator 1 hired the defendant

JARED MITCHELL and gave MITCHELL money to pay a network of corrupt registered brokers

(the "Corrupt Brokers"), including the defendants RICHARD BROWN, GERALD COCUZZO,

NAVEED KHAN, MAROOF MIYANA and PRANAV PATEL, in exchange for the Corrupt

Brokers recommending and then purchasing ForceField stock in their clients' brokerage accounts.

Specifically, Co-Conspirator 1 paid MITCHELL a ten percent commission or kickback for

purchases of ForceField shares generated by the Corrupt Brokers, which MITCHELL then shared

with the Corrupt Brokers who generated the ForceField stock purchases.   MITCHELL, the

Corrupt Brokers and Co-Conspirator 1 did not disclose to the Corrupt Brokers' clients the ten

percent commission or kickbacks paid to the Corrupt Brokers for the clients' purchases of

ForceField stock.

        18.    In an effort to conceal the source of the kickbacks, Co-Conspirator 1

transferred funds from ForceField's bank accounts in the United States to AOHC's offshore bank

accounts and often paid the defendant JARED MITCHELL through AOHC's bank accounts.

Additionally, Co-Conspirator 1, MITCHELL and the Corrupt Brokers, including the defendants

RICHARD BROWN, GERALD COCUZZO, NAVEED KHAN, MAROOF MIYANA and

PRANAV PATEL, used prepaid, disposable cellular telephones and encrypted, content-expiring

messaging applications such as Wickr and Threema to communicate with each other.

MITCHELL also attempted to conceal his kickback payments to the Corrupt Brokers by

withdrawing large sums of money from his bank account and paying the Corrupt Brokers in cash.

19.     Between October 2014 and April 2015, in at least thirty of the instances in

which the defendant JARED MITCHELL, who referred to himself as the "brown bag man,"

withdrew cash from his bank account, one or more of the Corrupt Brokers was in close proximity

to MITCHELL during or shortly after the withdrawals.   MITCHELL tracked wire transfers he

received from Co-Conspirator 1 and his payment of kickbacks to the Corrupt Brokers, including

the defendants RICHARD BROWN, GERALD COCUZZO, NAVEED KHAN, MAROOF

MIYANA and PRANAV PATEL, in an Excel spreadsheet (the "Kickback Accounting

Spreadsheet") that he periodically sent to Co-Conspirator 1.   The Kickback Accounting

Spreadsheet contained: (a) the date and amount of each kickback paid to the Corrupt Brokers; (b)

the date and amount of each wire transfer received by MITCHELL in relation to the scheme; (c)

the date and amount of each cash withdrawal MITCHELL made to pay kickbacks to the Corrupt

Brokers; and (d) the money MITCHELL had been paid to date by Co-Conspirator 1, the money he

owed to the Corrupt Brokers and the quantity of ForceField shares purchased by the Corrupt

Brokers' clients.

20.     Between October 2014 and April 2015, the defendant RICHARD BROWN

purchased more than 256,000 shares of ForceField stock in brokerage accounts for at least eight

different clients for a total cost of approximately $1,735,000.   Over this time period, the

defendant JARED MITCHELL communicated and coordinated with BROWN on a regular basis

and paid BROWN more than $30,000 in kickbacks, and, according to the Kickback Accounting

Spreadsheet, MITCHELL owed BROWN an additional $55,000 in kickbacks.   Moreover, during

the same time period, MITCHELL and BROWN were in approximately the same location on

multiple occasions shortly after MITCHELL withdrew large sums of cash from his banking

account.

21.      Between January 2015 and April 2015, the defendant GERALD

COCUZZO purchased more than 65,000 shares of ForceField stock in brokerage accounts for at

least thirteen different clients for a total cost of more than $485,000.   Over this time period, the

defendant JARED MITCHELL communicated and coordinated with COCUZZO on a regular

basis and paid COCUZZO more than $18,500 in kickbacks, and, according to the Kickback

Accounting Spreadsheet, MITCHELL owed COCUZZO an additional $15,000 in kickbacks.

Moreover, during the same time period, MITCHELL and COCUZZO were in approximately the

same location on multiple occasions shortly after MITCHELL withdrew large sums of cash from

his banking account.

22.      Between February 2015 and April 2015, the defendant NAVEED KHAN

purchased more than 69,000 shares of ForceField stock in brokerage accounts for at least

forty-seven different clients for a total cost of more than $531,405.   Over this time period, the

defendant JARED MITCHELL communicated and coordinated with KHAN on a regular basis and

paid KHAN more than $49,000 in kickbacks, and, according to the Kickback Accounting

Spreadsheet, MITCHELL owed KHAN additional kickbacks.   Moreover, during the same time

period, MITCHELL and KHAN were in approximately the same location on multiple occasions shortly after MITCHELL withdrew large sums of cash from his banking account.

23.     Between March 2015 and April 2015, the defendant MAROOF MIYANA purchased more than 30,000 shares of ForceField stock in brokerage accounts for at least twenty-one different clients for a total cost of more than $250,000.   Over this time period, the defendant JARED MITCHELL communicated and coordinated with MIYANA on a regular basis and paid MIYANA more than $2,800 in kickbacks, and, according to the Kickback Accounting Spreadsheet, MITCHELL owed MIYANA additional kickbacks.   Moreover, during the same time period, MITCHELL and MIYANA were in approximately the same location on multiple occasions shortly after MITCHELL withdrew large sums of cash from his banking account.

24.     Between March 2015 and April 2015, the defendant PRANAV PATEL purchased more than 8,100 shares of ForceField stock in brokerage accounts for at least five different clients for a total cost of more than $62,855.   Over this time period, the defendant JARED MITCHELL communicated and coordinated with PATEL on a regular basis and paid PATEL more than $2,100 in kickbacks.   Moreover, MITCHELL and PATEL were in approximately the same location on or about April 15, 2015, the same day that the Kickback Accounting Spreadsheet shows that MITCHELL paid "Pranav" $2,144.

B.     The Corrupt Promoters

25.     In furtherance of the fraudulent scheme, from approximately December 2009 to April 2015, Co-Conspirator 1 also hired individuals (the "Corrupt Promoters"), including the defendants CHRISTOPHER F. CASTALDO, HERSCHEL C. KNIPPA III and LOUIS F. PETROSSI, to promote ForceField and to induce investors to purchase ForceField stock or enter into private placements with ForceField without disclosing to potential investors their kickback

arrangements with Co-Conspirator 1.   Through a series of private placements, ForceField raised

more than $19.7 million from investors, a number of whom were induced to invest by

Co-Conspirator 1 and the Corrupt Promoters at investor conferences and annual shows.

26.     From approximately June 2011 to June 2014, the defendant

CHRISTOPHER F. CASTALDO, together with individuals who worked for him in Glenwood

Landing, New York, promoted ForceField to potential investors by telephone calls and in person

and by publishing investment research reports touting ForceField's stock.   In total, CASTALDO

solicited more than $600,000 in purchases of ForceField stock from more than forty investors.

Between June 2011 and January 2012, Co-Conspirator 1 caused AOHC and other entities he

controlled to wire more than $128,000 in payments to a WSBSH bank account controlled by

CASTALDO.   Between June 2012 and January 2014, Co-Conspirator 1 issued approximately

86,000 shares of ForceField to WSBSH, which CASTALDO later sold for a profit of more than

$229,000.   CASTALDO did not fully disclose the commissions he and WSBSH received from

Co-Conspirator 1 for his promotion of ForceField to investors or potential investors.

27.     From approximately July 2014 to March 2015, Co-Conspirator 1 paid the

defendant HERSCHEL C. KNIPPA III kickbacks for promoting ForceField to investors.

KNIPPA promoted ForceField to potential investors by making presentations about ForceField at

investor conferences and by speaking about ForceField on the Fox Business and Business News

Network channels.   For example, on or about July 15, 2014, KNIPPA appeared on "Varney &

Co.," a financial news show on the Fox Business channel, and recommended purchasing

ForceField stock.   When the host asked KNIPPA whether he owned ForceField shares, KNIPPA

responded, "You bet I do.   I put my money where my mouth is."   Contrary to his assertion,

KNIPPA did not, at the time, own ForceField stock and KNIPPA failed to disclose that he was

being paid to promote ForceField.   In total, KNIPPA solicited more than $1.19 million in

ForceField private placements from at least ten investors.   In return, Co-Conspirator 1 caused

ForceField to wire commission payments of between ten and fifteen percent of the investments

KNIPPA solicited to AOHC accounts, which funds were then wired to a bank account controlled

by KNIPPA.   In sum, Co-Conspirator 1 wired more than $120,000 in kickbacks to KNIPPA.

Neither Co-Conspirator 1 nor KNIPPA disclosed to potential investors that KNIPPA received a

commission for soliciting their investments.

   28. From approximately January 2009 to April 2015, the defendant LOUIS F.

PETROSSI promoted the sale of ForceField stock to potential investors by telephone calls and in

person and through presentations at investor conferences.   During these presentations,

PETROSSI frequently represented that he was not being compensated by ForceField.   Contrary to

these representations, PETROSSI received from Co-Conspirator 1 a ten percent commission in the

form of cash and ForceField shares.   In total, PETROSSI solicited more than $4.5 million from

more than sixty investors in ForceField private placements.   Neither Co-Conspirator 1 nor

PETROSSI disclosed to potential investors the commissions PETROSSI received from

Co-Conspirator 1.

* * *

   29. Based on the fraudulent actions of the defendants JARED MITCHELL,

RICHARD BROWN, CHRISTOPHER F. CASTALDO, GERALD COCUZZO, NAVEED

KHAN, HERSCHEL C. KNIPPA III, MAROOF MIYANA, PRANAV PATEL and LOUIS F.

PETROSSI, and others, including Co-Conspirator 1, from approximately January 1, 2014 to April

10, 2015 alone, the price of ForceField's stock rose from a low of $4.55 per share to a high of $7.82

per share, an increase of approximately 42 percent.   At its peak share price, ForceField's market capitalization was approximately $131 million.

COUNT ONE
(Conspiracy to Commit Securities Fraud)

30.     The allegations contained in paragraphs one through twenty-nine are hereby realleged and incorporated by reference as if fully set forth in this paragraph.

31.     In or about and between December 2009 and April 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JARED MITCHELL, RICHARD BROWN, CHRISTOPHER F. CASTALDO, GERALD COCUZZO, also known as "Gerry," NAVEED KHAN, also known as "Nick," HERSCHEL C. KNIPPA III, also known as "Tres," MAROOF MIYANA, PRANAV PATEL and LOUIS F. PETROSSI, together with others, did knowingly and willfully conspire to use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in ForceField, in connection with the purchase and sale of investments in ForceField, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

11

32.     In furtherance of the conspiracy and to effect its objects, within the Eastern

District of New York and elsewhere, the defendants JARED MITCHELL, RICHARD BROWN,

CHRISTOPHER F. CASTALDO, GERALD COCUZZO, also known as "Gerry," NAVEED

KHAN, also known as "Nick," HERSCHEL C. KNIPPA III, also known as "Tres," MAROOF

MIYANA, PRANAV PATEL and LOUIS F. PETROSSI, together with others, committed and

caused to be committed, among others, the following:

### OVERT ACTS

a.     On or about September 6, 2010, Co-Conspirator 1 caused

ForceField to enter into a Finder's Fee Agreement with AOHC.

b.     On or about August 12, 2011, CASTALDO sent an e-mail to

Co-Conspirator 2, a ForceField executive whose identity is known to the Grand Jury, providing the

account and routing information for WSBSH's bank account.

c.     On or about July 5, 2012, PETROSSI sent an e-mail to

Co-Conspirator 1 informing Co-Conspirator 1 that he had identified a potential ForceField

investor and that this investor would be calling Co-Conspirator 1 to discuss investing in

ForceField.

d.     On or about September 6, 2013, CASTALDO sent an e-mail to

Co-Conspirator 1 about commissions, stating: "Are you wiring money today?   We are owed

$15K . . . we are owed money for the work we did.   We won't continue until we are brought up to

date."

e.     Or about September 9, 2013, CASTALDO sent an e-mail to

Co-Conspirator 1, stating: "Amazing[,] when we don't work you barely trade . . . Call me when

you are in NY, we don't work for free."

12

f.      On or about September 1, 2014, PETROSSI sent a text message to Co-Conspirator 1 in which he stated that "[w]e took in more than $200,000" at two investor conferences.

g.      On or about September 22, 2014, PETROSSI sent a text message to Co-Conspirator 1 in response to a request by Co-Conspirator 1 to purchase ForceField shares, in which he stated: "I will go to bank and get 5k does that help[?]   I am going to buy 1000 shares within [the] hour."

h.      On or about November 5, 2014, BROWN purchased approximately 4,000 shares of ForceField in his clients' brokerage accounts.

i.      On or about March 25, 2015, COCUZZO received a cash payment from MITCHELL and Co-Conspirator 1 in exchange for purchasing ForceField shares in his clients' brokerage accounts.

j.      On or about March 27, 2015, PATEL purchased approximately 4,000 shares of ForceField in his clients' brokerage accounts.

k.      On or about March 31, 2015, KNIPPA sent an e-mail to Co-Conspirator 1 to which he attached a spreadsheet that summarized the number of investors he had solicited for ForceField, the total amount of investment in the company for which he believed he was responsible and the commission he believed Co-Conspirator 1 owed him.

l.      On or about April 14, 2015, MIYANA purchased approximately 1,100 shares of ForceField in his clients' brokerage accounts.

m.      On or about April 15, 2015, MITCHELL sent an e-mail to Co-Conspirator 1 to which he attached a spreadsheet in which he recorded, among other things, the commissions owed to the Corrupt Brokers.

13

n.     On or about April 15, 2015, after an article exposing potential fraud at ForceField was published that caused ForceField's stock price to plummet, KHAN sent a series of text messages to Co-Conspirator 1, including the following: "I bought 2 days ago at 7. Yesterday at 5.50 and today at 4.17.   It goes down every minute.   You need to put [out] strong press to stop this.   I am so [expletive], this is a falling knife . . . people are angry at me for not selling Tuesday . . . I'm having them hang in there."

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT TWO
### (Conspiracy to Commit Wire Fraud)

33.     The allegations contained in paragraphs one through twenty-nine are hereby realleged and incorporated by reference as if fully set forth in this paragraph.

34.     In or about and between December 2009 and April 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JARED MITCHELL, RICHARD BROWN, CHRISTOPHER F. CASTALDO, GERALD COCUZZO, also known as "Gerry," NAVEED KHAN, also known as "Nick," HERSCHEL C. KNIPPA III, also known as "Tres," MAROOF MIYANA, PRANAV PATEL and LOUIS F. PETROSSI, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud investors and potential investors in ForceField, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

14

## COUNT THREE
(Money Laundering Conspiracy)

35.     The allegations contained in paragraphs one through twenty-nine are hereby realleged and incorporated by reference as if fully set forth in this paragraph.

36.     In or about and between December 2009 and April 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JARED MITCHELL, RICHARD BROWN, CHRISTOPHER F. CASTALDO, GERALD COCUZZO, also known as "Gerry," NAVEED KHAN, also known as "Nick," HERSCHEL C. KNIPPA III, also known as "Tres," MAROOF MIYANA, PRANAV PATEL and LOUIS F. PETROSSI, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds to one or more places in the United States from one or more places outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: fraud in the sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, contrary to Title 18, United States Code, Section 1956(a)(2)(A), and (b) to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT FOUR
(Securities Fraud)

37.     The allegations contained in paragraphs one through twenty-nine are hereby realleged and incorporated by reference as if fully set forth in this paragraph.

38.     In or about and between December 2009 and April 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JARED MITCHELL, RICHARD BROWN, CHRISTOPHER F. CASTALDO, GERALD

15

COCUZZO, also known as "Gerry," NAVEED KHAN, also known as "Nick," HERSCHEL C. KNIPPA III, also known as "Tres," MAROOF MIYANA, PRANAV PATEL and LOUIS F. PETROSSI, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in ForceField, in connection with the purchase and sale of investments in ForceField, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

### COUNT FIVE
(False Statements)

39.     The allegations contained in paragraphs one through twenty-nine are hereby realleged and incorporated by reference as if fully set forth in this paragraph.

40.     On or about May 27, 2015, within the Eastern District of New York, the defendant JARED MITCHELL, did knowingly and willfully make one or more materially false, fictitious and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit: an investigation by the Federal

Bureau of Investigation ("FBI"), in that MITCHELL stated and represented to a Special Agent of the FBI that he never paid any brokers to purchase ForceField stock in their clients' brokerage accounts, when in fact, as MITCHELL then and there well knew and believed, he had paid brokers to purchase ForceField stock in their clients' brokerage accounts.

(Title 18, United States Code, Sections 1001(a)(2) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS ONE, TWO AND FOUR

41.    The United States hereby gives notice to the defendants that, upon their conviction of the offenses charged in Counts One, Two and Four, the government will seek forfeiture, in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), of any property, real or personal, which constitutes or is derived from proceeds traceable to any such offenses, or any property traceable to such property.

42.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

17

seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT THREE

43.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Three, the government will seek forfeiture, in accordance with Title 18, United States Code, Section 982(a)(1), of any property, real or personal, involved in such offense, or any property traceable to such property.

44.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 982(a)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

19